UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DAVID TROUPE, | No.  13-CV-5036-EFS |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| WALTER J. END, | |
| Defendant. | |

Before the Court, without oral argument, is Defendant Walter End's Motion for Summary Judgment. ECF No. 50. Defendant asks the Court to dismiss Plaintiff David Troupe's Eighth Amendment claim as a matter of law, to find that Defendant is entitled to qualified immunity as a matter of law, to find that Plaintiff failed to support a claim for injunctive relief, and to apply a strike against Plaintiff under 42 U.S.C. § 1915. *Id.* at 3–4. Plaintiff opposes the motion. ECF No. 91. In this 42 U.S.C. § 1983 lawsuit, Mr. Troupe alleges that his Eighth Amendment right to be free from cruel and unusual punishment was violated by Mr. End, a relatively new Psychology Associate (PA) at the Washington State Penitentiary (WSP), who was

ORDER - 1

1  deliberately indifferent to the threat of serious harm to Mr. Troupe

2  on December 2, 2011, when Mr. End responded slowly to Mr. Troupe's

3  declaration of a mental health emergency.

4      On December 2, 2011, Mr. End had conducted a routine check of

5  Mr. Troupe who did not appear to be experiencing any mental distress

6  or other emergency.  After Mr. End left the area, Mr. Troupe declared

7  that he was experiencing a mental health emergency.  Mr. End responded

8  within 20 minutes.  During that 20-minute period, Mr. Troupe did not

9  harm himself or suffer any injury.  When Mr. End returned to Mr.

10 Troupe's cell, Mr. Troupe did not appear to be suffering any

11 discernible mental health emergency.  When Mr. End tried to discuss

12 the asserted mental health emergency with him, Mr. Troupe declined to

13 communicate with Mr. End, though he was capable of doing so.  Having

14 determined that Mr. Troupe was not experiencing an emergency, Mr. End

15 left the area once again, and within minutes, Mr. Troupe cut himself.

16 Mr. End was notified, responded timely, and acted properly in

17 response.  Having reviewed the pleadings and the file in this matter,

18 the Court is fully informed and finds no cruel and unusual punishment

19 in violation of the Eighth Amendment involving either Mr. End's

20 response to Mr. Troupe's self-declared mental health emergency or his

21 response to Mr. Troupe cutting himself.  Therefore, the Court grants

22 summary judgment to Defendant.

23 //

24 /

25

26

ORDER - 2

<table><tr><td>

1

</td><td>

<h3>I. <u>FACTUAL BACKGROUND</u>[1]</h3>

</td></tr></table>

Plaintiff David Troupe is an inmate who has been incarcerated by the Washington Department of Corrections (DOC) since 1999. May 3, 2013 Mental Health Appraisal at 091, Ex. 1, ECF No. 53-1; *see also* Offender Mgmt. Network Info., Attach. A, ECF No. 14-1, W.D. Wash. Case No. 3:14-CV-5650-BHS-JRC. He has spent much of that time in the Intensive Management Unit (IMU). May 3, 2013 Mental Health Appraisal at 086, Ex. 1, ECF No. 53-1. During his incarceration, Mr. Troupe has committed hundreds of infractions. Infraction Report, Ex. 10, ECF No. 54-1. Additionally, Mr. Troupe has filed at least 14 cases against DOC staff in state and federal court, four of which are currently pending before this Court. *See* Ex. 11, ECF No. 54-2; Case No. 13-CV-5028-EFS; Case No. 13-CV-5038-EFS; Case No. 15-CV-5021-EFS.

Mr. Troupe has a documented history of obstructive, manipulative, and staff-splitting behaviors and frequently threatens self-harm to achieve his objectives. June 4, 2013 Email from Tamara Russell at 081, Ex. 1, ECF No. 53-1; Mental Health Appraisal at 086–87, Ex. 1, ECF No. 53-1; Jan. 1, 2013 Primary Encounter Report (PER) at 105–06, Ex. 1, ECF No. 53-1; May 4, 2012 Suicide Prevention Assessment at 109, Ex. 1, ECF No. 53-1; Sept. 19, 2012 PER at 111–12, Ex. 1, ECF No. 53-1; Aug. 28, 2012 PER at 116, Ex. 1, ECF No. 53-1;

---

[1] When considering this motion and creating this factual section, the Court (1) believed the undisputed facts and the non-moving party's evidence, (2) drew all justifiable inferences therefrom in the non-moving party's favor, (3) did not weigh the evidence or assess credibility, and (4) did not accept assertions made by the non-moving party that were flatly contradicted by the record. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Aug. 27, 2012 PER at 117, Ex. 1, ECF No. 53-1; May 21, 2012 PER at 118, Ex. 1, ECF No. 53-1; Aug. 13, 2010 Psychiatric Consultation at 124, Ex. 1, ECF No. 53-1; Nov. 30, 2011 Note at 132, Ex. 1, ECF No. 53-1; Sept. 22, 2010 Admission Note at 133, Ex. 1, ECF No. 53-1; Specialized Protocol at 163 (Aug. 17, 2010), Ex. 1, ECF No. 53-1; Feb. 29, 2012 PER at 166, Ex. 1, ECF No. 53-1; Feb. 24, 2012 PER at 167, Ex. 1, ECF No. 53-1; Feb. 1, 2012 PER at 168, Ex. 1, ECF No. 53-1; Nov. 4, 2011 PER at 172, Ex. 1, ECF No. 53-1; Jan. 22, 2010 Note at 183, Ex. 3, ECF No. 53-3; Jan. 10, 2010 Note at 184, Ex. 3, ECF No. 53-3; Oct. 22, 2009 Note at 185, Ex. 3, ECF No. 53-3; Jan. 23, 2012 PER at 186, Ex. 3, ECF No. 53-3; Feb. 21, 2013 PER at 193, Ex. 4, ECF No. 53-4; Dec. 17, 2011 PER at 202, Ex. 4, ECF No. 53-4; Jan. 23, 2012 Emergency Grievance at 218, Ex. 6, ECF No. 53-6; Decl. of Karen Gleason at 2-3, ECF No. 55; Decl. of Bonnie Klahn at 2, ECF No. 56; Nov. 19, 2010 Psychology Suicide Risk Assessment, Attach. 3, ECF No. 91-1.

For example, around the time of the events at issue in this case, Mr. Troupe was requesting to work with a particular mental health provider (Ms. Calkins) and trying to avoid working with the other two mental health providers (Mr. End and Mr. Beck). Nov. 4, 2011 PER at 172, Ex. 1, ECF No. 53-1 (reporting Mr. Troupe appeared frustrated that he was not seen by Ms. Calkins and that she is always unavailable when he needs to talk to a counselor); Dec. 2, 2011 Suicide Risk Assessment at 180, Ex. 3, ECF No. 53-3 (requesting to work with Ms. Calkins); David Troupe, Level 1-Initial Grievance at 211 (Dec. 6, 2011), Ex. 6, ECF No. 53-6 (requesting another mental health

provider); Appeal to Level II at 215 (Dec. 20, 2011), Ex. 6, ECF No. 53-6 (stating he does not feel comfortable with Mr. End or Mr. Beck and asking to work with someone else); Appeal to Level III at 216 (Jan. 18, 2012), Ex. 6, ECF No. 53-6 ("Requesting to be assigned to MHP Caukins [sic] since I do not get along with MHP Beck nor MHP End. . . . Please assign me to MHP Caukins' [sic] case load."); Decl. of Bonnie Klahn at 2, ECF No. 56.

Plaintiff asserts that the assessment of his behavior as manipulative rather than suicidal and a risk of serious harm began in summer 2011 when he threatened to file a lawsuit against WSP. Response Brief at 15, ECF No. 91. This assertion is flatly contradicted by the evidence in the record. *See* Jan. 22, 2010 Note at 183, Ex. 3, ECF No. 53-3; Jan. 10, 2010 Note at 184, Ex. 3, ECF No. 53-3; Oct. 22, 2009 Note at 185, Ex. 3, ECF No. 53-3; Nov. 19, 2010 Suicide Risk Assessment, Attach. 3, ECF No. 91-1; Sept. 22, 2010 Admission Note, Attach. 11, ECF No. 91-1 (characterizing Mr. Troupe's behavior as manipulative prior to 2011).

Mr. Troupe has a history of declaring emergencies for non-emergent reasons. *See* Jan. 4, 2012 PER at 169, Ex. 1, ECF No. 53-1 (declared mental health emergency to ask where Mr. Beck was located); Mar. 6, 2010 Note at 182, Ex. 3, ECF No. 53-3 (declared mental health emergency to complain about leaky pipe in his cell); Jan. 10, 2010 Note at 184, Ex. 3, ECF No. 53-3 (declared non-emergency chest pains then denied chest pain and complained that he did not get a shower); Oct. 22, 2009 Note at 185, Ex. 3, ECF No. 53-3 (reported feeling suicidal then complained that he was not allowed to shower); Jan. 23,

2012 PER at 186, Ex. 3, ECF No. 53-3 (declared mental health emergency then complained that his mail had been held for five weeks); Dec. 5, 2011 PER at 206, Ex. 5, ECF No. 53-5 (declared mental health emergency because he wanted to talk about switching primary practitioners). Plaintiff states that any stressful situation is an emergency for him because it can cause thoughts of self-harm. Response Brief at 9, ECF No. 91.

In October 2011, Defendant Walter End began working as a PA at WSP and was assigned to work with Mr. Troupe. Decl. of Walter End at 1-2, ECF No. 53. The parties agree that Mr. End received yearly suicide-prevention training. Response Brief at 5, ECF No. 91; Defendant's Reply Statement of Facts at 3, ECF No. 100. When Mr. Troupe was assigned to his caseload, Mr. End reviewed all five volumes of Mr. Troupe's medical file. *Id.* at 3. Mr. Troupe has been diagnosed with a number of mental health disorders over the years, including attention deficit hyperactivity disorder, narcissistic personality disorder, bipolar disorder, and antisocial personality disorder. *See* Aug. 20, 2013 Psychiatric Evaluation at 076-78, Ex. 1, ECF No. 53-1; Mental Health Appraisal at 086, Ex. 1, ECF No. 53-1; July 27, 2011 Psychological Report at 227-28, Ex. 6, ECF No. 53-6; Oct. 15, 2012 Medical Record at 249-50, Ex. 9, ECF No. 53-9; *see also* Attach. 3, ECF No. 91-1. Mr. Troupe states that he has attempted suicide four times, most recently in March 2009. Response Brief at 13, ECF No. 91; *see also* Attachs. 9 & 10, ECF No. 91-1.

Based on his review of Mr. Troupe's file and on his personal observation of Mr. Troupe, Mr. End did not consider Mr. Troupe to be

at risk of suicide during the time Mr. End worked with him.  Decl. of Walter End at 16–17, ECF No. 53.  Instead, Mr. End believed that all of Mr. Troupe's attempts at self-harm were to gain a specific result. *Id.* at 17.  Documents in Mr. Troupe's medical records prepared by other providers support Mr. End's assessment.  *See, e.g.*, Aug. 27, 2012 PER at 117, Ex. 1, ECF No. 53-1; May 21, 2012 PER at 118, Ex. 1, ECF No. 53-1; Feb. 3, 2012 PER at 122, Ex. 1, ECF No. 53-1; Feb. 29, 2012 PER at 166, Ex. 1, ECF No. 53-1; July 27, 2011 Psychological Report at 223, Ex. 6, ECF No. 53-6.  Ms. Klahn, the WSP Mental Health Program manager, agreed that Mr. Troupe was not an "imminent suicide risk from the summer of 2011 through 2012 when he was at WSP."  Decl. of Bonnie Klahn at 4, ECF No. 56.

Mr. Troupe asserts that Mr. End knew that he had suicidal tendencies.  Response Brief at 5, ECF No. 91.  He cites to a January 25, 2012 interview resulting from a Prison Rape Elimination Act complaint filed by Mr. Troupe against Mr. End, in which Mr. End stated that all of the times Mr. End saw Mr. Troupe at his cell front, "it was emergent.  He was either ripping his wound open, or peeling his stitches out or slicing a new wound or something like that where there was blood everywhere and it was a crisis situation."  Attach. 1, ECF No. 91-1.  Even construing the facts in the light most favorable to Mr. Troupe, this does not mean that all of Mr. Troupe's self-harm events were emergencies or attempted suicide, but instead that Mr. End often saw Mr. Troupe at cell front, not in the normal course of treatment, but rather because Mr. Troupe was harming himself. Therefore, Mr. Troupe provides no support for his assertion that Mr.

1  End believed that Mr. Troupe was suicidal, and it is undisputed that
2  Mr. End did not believe that Mr. Troupe was suicidal during the time
3  period relevant to this case.

4      Mr. Troupe also appears to assert that Mr. End should have known
5  that Mr. Troupe was at significant risk of suicide or serious harm
6  because other providers classified Mr. Troupe as suicidal in the past.
7  Mr. Troupe points to a statement by PA Thomas Roe on June 27, 2011
8  that, "Mr. Troupe is most capable of continually planning self harm
9  events, perhaps even suicidal events, while presenting as 'normal' and
10 baseline. For that reason, I shall continue with the restraint table
11 placement within the plan described below." June 27, 2011 PER,
12 Attach. 2, ECF No. 91-1. Mr. Roe wrote this in a PER Intake Note and
13 Initial Treatment Plan after Mr. Troupe had harmed himself twice in
14 the previous 72 hours and had been placed on the six-point restraint
15 table to prevent further self-harm. *Id.* Mr. Roe's Treatment Plan
16 addressed the question of how long Mr. Troupe should remain on the
17 restraint table. *Id.*

18     In response, Defendants cite the declaration of Mr. Roe in case
19 number 13-CV-5038 in which he states, "In the time I observed Mr.
20 Troupe and was involved in his treatment in 2011 and 2012, I never
21 evaluated Mr. Troupe to be suicidal." Decl. of Thomas Roe at 3, ECF
22 No. 86, Case No. 13-CV-5038. Less than a year after he made the
23 statement on which Mr. Troupe relies, Mr. Roe wrote that Mr. Troupe's
24 self-harm events were voluntary and "designed for legal issues and
25 grievances." Feb. 29, 2012 PER at 166, Ex. 1, ECF No. 53-1. Viewed
26 in context and together with his other statements, Mr. Roe's statement

on July 27, 2011, that Mr. Troupe was "perhaps even" capable of planning suicidal events, does not indicate that Mr. Roe believed Mr. Troupe was suicidal or suggest that Mr. End should have known that Mr. Troupe was suicidal during the time period at issue in this case. Additionally, Mr. Troupe has never asserted that he was suicidal during the relevant time period.

The events at issue in this case occurred on December 2, 2011. Complaint, ECF No. 1. At that time, Mr. Troupe was housed in the IMU under a sharps restriction and orders for his fingernails to be cut at a length that would prevent him from using them to cut himself. Decl. of Walter End at 14, ECF No. 53; Aug. 30, 2012 Conditions of Confinement – Mental Health at 113, Ex. 1, ECF No. 53-1; Aug. 29, 2012 PER at 114–15, Ex. 1, ECF No. 53-1; Specialized Protocol at 163 (Aug. 17, 2010), Ex. 1, ECF No. 53-1. Although Mr. Troupe's medical providers frequently placed Mr. Troupe in restraints to prevent continuing self-harm, they agreed it was preferable to keep Mr. Troupe in the IMU and avoid placing him in restraints whenever possible. Feb. 21, 2013 PER at 098, Ex. 1, ECF No. 53-1; May 21, 2012 PER at 118, Ex. 1, ECF No. 53-1; June 27, 2011 PER, Attach. 2, ECF No. 91-1. Inmates in the IMU are checked at least every 30 minutes. Decl. of Walter End at 14, ECF No. 53. Under DOC's Suicide Prevention Policy, supervision of an inmate is increased when self-harm is a serious concern, Ex. 8, ECF No. 53-8, but Mr. Troupe states that custody did not do increased tier checks on December 2, 2011. Response Brief at 11, ECF No. 91. He provides no support for this assertion, although the Court assumes it is based on his personal knowledge. *Id.*

1    On December 2, 2011, Mr. End checked on Mr. Troupe as part of

2 his regular duties, and Mr. Troupe "did not present as having any

3 mental health emergency." Decl. of Walter End at 15, ECF No. 53. The

4 officers on duty in the IMU had not noted any changes in Mr. Troupe's

5 behavior in their log books, which Mr. End checked. *Id.* At

6 approximately 3:45 pm, after Mr. End left the IMU, Mr. Troupe

7 contacted the booth officer and declared a mental health emergency.

8 David Troupe, Level 1-Initial Grievance at 211 (Dec. 6, 2011), Ex. 6,

9 ECF No. 53-6; Decl. of Walter End at 15, ECF No. 53. Approximately

10 ten to fifteen minutes later, around 4:00 pm, Mr. Troupe contacted the

11 booth officer again and stated that if he did not see someone within

12 five minutes he would harm himself. *Compare id.* (10 minutes later),

13 *with*, Second Amended Complaint at 1, ECF No. 16 (15 minutes later).

14 Mr. End arrived in the IMU approximately five minutes later, around

15 4:05 pm. David Troupe, Level 1-Initial Grievance at 211 (Dec. 6,

16 2011), Ex. 6, ECF No. 53-6; Decl. of Walter End at 15, ECF No. 53.

17 Mr. End "expected that Mr. Troupe was up to something due to his

18 specific demand that [Mr. End] be there within 5 minutes and based

19 upon his prior kites regarding the response time." Decl. of Walter

20 End at 15, ECF No. 53; *see also*, Mar. 18, 2012 Kite at 195, Ex. 4, ECF

21 No. 53-4.

22    Mr. Troupe states that he yelled to Mr. End that he was

23 "suicidal/self harmful" when Mr. End entered the IMU. Response Brief

24 at 7, ECF No. 91. He asserts that there is a report that will support

25 this but that the report is missing from the record. *Id.* Because

26 there is nothing in the record supporting his assertion—nothing in his

Level I Grievance, nothing in his Level II Appeal, nothing in his Level III Appeal, and nothing in Mr. End's account of the event—the Court discounts his assertion. *See* David Troupe, Level 1-Initial Grievance at 211 (Dec. 6, 2011), Ex. 6, ECF No. 53-6; Appeal to Level II at 215 (Dec. 20, 2011), Ex. 6, ECF No. 53-6; Appeal to Level III at 216 (Jan. 18, 2012), Ex. 6, ECF No. 53-6; Decl. of Walter End at 16, ECF No. 53. Mr. Troupe states Mr. End walked upstairs and spoke to other inmates. David Troupe, Level 1-Initial Grievance at 211 (Dec. 6, 2011), Ex. 6, ECF No. 53-6. According to Mr. Troupe, while Mr. End was upstairs he could not see Mr. Troupe. Response Brief at 17, ECF No. 91. Mr. End next walked downstairs and spoke to other inmates, before "finally" checking on Mr. Troupe who "did not feel comfortable talking to him." David Troupe, Level 1-Initial Grievance at 211 (Dec. 6, 2011), Ex. 6, ECF No. 53-6. Mr. Troupe stated that he felt slighted because Mr. End talked to other inmates. Appeal to Level II at 215 (Dec. 20, 2011), Ex. 6, ECF No. 53-6.

Mr. End declares that upon arriving in the IMU he looked in on Mr. Troupe who appeared in no distress. Decl. of Walter End at 16, ECF No. 53. Mr. End states that he asked Mr. Troupe about his well-being and mental status but Mr. Troupe refused to respond, which was typical behavior for him. *Id.* Mr. End remained in the IMU for approximately 20 minutes, until approximately 4:25 pm, checking on other offenders and monitoring Mr. Troupe's behavior.[2] *Id.* He again

---

[2] Mr. Troupe asserts that an unknown inmate witness will testify that Mr. End did not spend 10, 15, or 20 minutes in the IMU on December 2, 2011, but that Plaintiff does not know his name. Response Brief at 19, ECF No. 91. However, even if this unknown inmate were located, his proposed testimony would conflict with Mr. Troupe's allegation that it took Mr. End 15 minutes

1  checked on Mr. Troupe before he left the area, and Mr. Troupe still

2  appeared fine with no indication of distress. *Id.*

3    Although Mr. Troupe and Mr. End provide somewhat different

4  accounts of the order of events during Mr. End's response to Mr.

5  Troupe's self-declared mental health emergency on December 2, 2011,

6  there is no material difference in their accounts.  It is clear that

7  Mr. End responded and offered counseling and that Mr. Troupe declined

8  to communicate with him.  It is also apparent that when Mr. End

9  assessed him, Mr. Troupe had not harmed himself and there was nothing

10 from which Mr. End could reasonably infer that self-harm was imminent.

11   Around 4:30 pm, approximately five minutes after Mr. End left

12 the IMU for a second time, Mr. Troupe cut himself.  Level 1-Initial

13 Grievance filed by David Troupe on Dec. 6, 2011 at 211, Ex. 6, ECF No.

14 53-6; Dec. 2, 2011 PER at 234, Ex. 6, ECF No. 53-6; Decl. of Walter

15 End at 16, ECF No. 53.  Mr. End was contacted, appropriately and

16 timely returned to the IMU, and observed that Mr. Troupe had harmed

17 himself and smeared blood on his cell walls.  Mr. Troupe was taken for

18 medical care, and Mr. End suggested that Mr. Troupe be admitted to the

19 mental health unit for self-harm watch.  Dec. 2, 2011 PER at 234, Ex.

20 6, ECF No. 53-6; Decl. of Walter End at 16-17, ECF No. 53.

21   At approximately 4:50 pm, Mr. Troupe arrived in the trauma room

22 where he refused to answer questions asked by nursing staff.  Dec. 2,

23 2011 PER at 231, Ex. 6, ECF No. 53-6.  Nursing notes indicate that Mr.

24 Troupe had concealed a blade in an unhealed open left leg wound from

25 which he had removed the sutures and for which he had been refusing

26 after arriving at the IMU to see Mr. Troupe at his cell front.  Second
   Amended Complaint at 2, ECF No. 16.

treatment, and he used the blade to cut an approximately 10-centimeter laceration in his right leg. Dec. 2, 2011 Note at 194, Ex. 4, ECF No. 53-4; Dec. 2, 2011 PER at 231, Ex. 6, ECF No. 53-6. He refused medical treatment for his left leg at 4:55 pm and refused all medical treatment at 5:00, stating, "I am tired of these bitch-ass games." *Id.* After being assessed by a provider, he was cleared to go without treatment. *Id.* At 5:05 pm, he was placed on the four-point restraint table to prevent further self-harm. *Id.* Once there, Mr. Troupe changed his mind and requested treatment for his right leg. *Id.;* Dec. 2, 2011 Note at 194, Ex. 4, ECF No. 53-4.

When the nurse practitioner began to suture his right leg wound, she noted the following,

> Mr. Troupe began to verbally escalate and stated "Somebody's a bitch tonight, I must have really pissed you off making you come in, if I knew your schedule I would cut myself every time you were on. You must be on you [sic] period, (sniffing the air) no you must be in menopause." Mr. Troupe appeared to be sexually aroused when I was suturing his laceration. He continued to state, "You bitch, you know I can get your address and send a bunch of inmates out to get you." At that point, he refused any further medical care and I was unable to tie off the running stitch do [sic] to his thrashing on the four point table so it was removed.

Dec. 2, 2011 Note at 194, Ex. 4, ECF No. 53-4. On or shortly after the day of the incident, a suicide risk assessment prepared by a mental health provider stated that the cut on Mr. Troupe's leg required 12 sutures, Suicide Risk Assessment at 180, Ex. 3, ECF No. 53-3; however the Court has not located any records documenting that Mr. Troupe eventually consented to have the wound treated.

1    Mr. Troupe did not assert that he was attempting suicide on

2  December 2, 2011.  He reported that his self-harming behavior was due

3  to being placed in a new cell that was filthy, though he did not

4  communicate this to Mr. End when Mr. End responded to his self-

5  declared mental health emergency.   Dec. 2, 2011 Suicide Risk

6  Assessment at 180, Ex. 3, ECF No. 53-3.  Mr. Troupe now states that,

7  "A cut on the body, especialy [sic] a deep cut is the beginning of a

8  suicide attempt because bleeding can lead to death."  Response Brief

9  at 10, ECF No. 91.  He provides no support for this assertion.  *Id*.

10 Mr. Troupe states that his injury was serious because it required

11 stitches and could have become infected, bled excessively, or caused

12 the loss of his limb.  Response Brief at 8, ECF No. 91.  He attaches a

13 document from July 6, 2012, in which a doctor stated that the wound on

14 Mr. Troupe's lower left leg had been there off and on since 2009, that

15 he had consistently refused treatment, and that he had irritated it to

16 the point where his leg was in danger if his behavior persisted.  July

17 6, 2012 PER, Attach. 8, ECF No. 91-1.  Although Mr. Troupe's wound may

18 have posed a danger to his leg months after the events at issue here

19 due to Mr. Troupe's own actions in continuously irritating it, the

20 record demonstrates that WSP personnel always promptly and properly

21 offered treatment for his wounds.

22    Mr. Troupe states that on March 21, 2013, Mr. End told him it

23 was too bad Mr. Troupe did not kill himself on December 2, 2011.

24 Response Brief at 18, ECF No. 91.   Mr. Troupe supports this with

25 affidavits from two other inmates.  Attach. 14, ECF No. 91-1.

26

ORDER - 14

Mr. Troupe filed this case on March 28, 2013. Complaint, ECF No. 1. In it, he asserts an Eighth Amendment deliberate indifference claim against Mr. End for failing to respond rapidly enough on December 2, 2011, when Mr. Troupe declared a mental health emergency and failing to take steps to prevent a substantial risk of serious self-harm. Second Amended Complaint at 5, ECF No. 16. More recently, at his deposition on April 15, 2015, Mr. Troupe stated, "As far as Walter End is concerned, that really wasn't that big of an issue for me. I was actually in the process of thinking about — Well, I was already thinking about it, but I was in the process of trying to think about whether or not I was going to withdraw that lawsuit." Dep. of David Troupe, Ex. 14, Decl. of Amy Clemmons, ECF No. 79-1. Mr. Troupe has not taken steps to withdraw his lawsuit at this time.

## II.   LEGAL STANDARDS

**A.   Summary Judgment**

Summary judgment is appropriate if the record establishes "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party opposing summary judgment must point to specific facts establishing a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of

proof, the trial court should grant the summary-judgment motion. *Celotex Corp.*, 477 U.S. at 322.

A party seeking or opposing summary judgment must support its assertion that there is or is not a genuine dispute of material fact by citing to particular materials in the record or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996). "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Fed. Trade Comm'n v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

**B.    Eighth Amendment**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and imposes a duty on prison officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "A prison official's 'deliberate indifference' to a substantial risk of harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828. "For an inmate to bring a valid § 1983 claim against a prison official for

violation of the Eighth Amendment, he must first objectively show that he was deprived of something sufficiently serious." *Lemire v. Cal. Dept. of Corr. and Rehabilitation*, 726 F.3d 1062, 1074 (9th Cir. 2013) (internal quotations omitted). "[T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The Court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). "[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to" state an Eighth Amendment claim. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). "The objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt." *Lemire*, 726 F.3d at 1075–76.

"Next, the inmate must make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety." *Lemire*, 726 F.3d at 1074. Deliberate indifference exists when an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The test for deliberate indifference is "subjective recklessness." *Id.* at 839–40. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial

risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. "[P]rison officials who act reasonably cannot be found liable under the [Eighth Amendment]." *Id.* at 845.

"Finally, plaintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries." *Lemire*, 726 F.3d at 1074.

**C.    Qualified Immunity**

Qualified immunity shields government officials performing discretionary functions from civil liability if their actions were objectively reasonable in light of clearly established law at the time they acted. *See Brosseau v. Haugen,* 543 U.S. 194, 198 (2004). The Supreme Court has laid out a two-pronged inquiry for determining whether a public official enjoys qualified immunity: (1) the trial court examines the facts alleged in the light most favorable to the plaintiff and determines whether the officer's alleged conduct violated a constitutional right, and (2) the court decides whether that right was clearly established at the time of the alleged violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). The court may exercise its discretion as to which of the two prongs to address

first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 553 U.S. at 202. If an official's alleged conduct violated a clearly established constitutional right of which a reasonable officer would have known, he is not entitled to qualified immunity. *Id.*

**D.    Injunction**

"An inmate seeking an injunction . . . must adequately plead . . a violation" that is likely to continue. *Id.* at 846.

> [T]o survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

*Id.* at 846. "Of course, a district court should approach issuance of injunctive orders with the usual caution." *Id.* at 846–47.

**E.    28 U.S.C. § 1915**

Section 1915(g) states,

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). A frivolous claim is one that lacks a basis in law or fact, and a malicious claims is one filed "with the intention

1  or desire to harm another." *Knapp v. Hogan*, 738 F.3d 1106, 1109 (9th

2  Cir. 2013).    A  summary-judgment  dismissal  which  states  that  the

3  dismissed action was frivolous, malicious, or failed to state a claim

4  counts as a "strike" under § 1915(g). *Blakely v. Wards*, 738 F.3d 607,

5  613 (4th Cir. 2013).

6  ### III. <u>ANALYSIS</u>

7  **A.    Eighth Amendment**

8  The  Court  now  analyzes  whether  Mr.  End  violated  the  Eighth

9  Amendment by (1) failing to respond rapidly enough to Mr. Troupe's

10  threat of self-harm, and (2) leaving Mr. Troupe in the IMU under the

11  same conditions after Mr. Troupe threatened self-harm.

12  The  threshold  issue  is  whether  Mr.  End's  action  or  omission,

13  objectively, deprived Mr. Troupe of something "sufficiently serious"

14  and  caused  him  to  be  "incarcerated  under  conditions  posing  a

15  substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *Lemire*,

16  726 F.3d at 1074.    This question of fact must be determined by the

17  jury "if there is any room for doubt." *Lemire*, 726 F.3d at 1075-76.

18  The  Court  finds  that  no  reasonable  jury  could  determine  that  Mr.

19  Troupe was deprived of something sufficiently serious and exposed to a

20  substantial risk of serious harm, when, according to Mr. Troupe, Mr.

21  End did not immediately report to Mr. Troupe's cell upon learning that

22  Mr. Troupe had declared he was experiencing a mental health emergency.

23  Additionally, no reasonable jury could find that the conditions of Mr.

24  Troupe's  confinement  in  the  IMU—sharps  restriction,  fingernail-

25  trimming  order,  and  checks  at  least  every  30  minutes—posed  a

26  substantial risk of serious harm.

ORDER - 20

The record shows that Mr. Troupe consistently cut himself in a non-life-threatening way.    The record also shows that he was not suicidal during the relevant time period.  His wounds were potentially serious only if left untreated or if repeatedly re-opened.    WSP personnel, including Mr. End, always offered prompt and proper medical treatment to Mr. Troupe.    Thus, any risk to Mr. Troupe's health was the result of his own decision to refuse treatment and to repeatedly harm himself in the same area.    Mr. Troupe's self-harm was not sufficiently serious, he was not incarcerated under conditions posing a substantial risk of serious harm, and any harm he suffered was not the result of Mr. End's actions or inaction on December 2, 2011. Therefore, summary judgment for Mr. End is appropriate.

Even if the Court found a genuine dispute of material fact as to whether Mr. Troupe was deprived of something sufficiently serious, summary judgment for Mr. End would still be appropriate because Mr. End did not have a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834.    Mr. End cannot be found liable under the Eighth Amendment unless he knew of and disregarded an excessive risk to Mr. Troupe's health and safety.  *Id.* at 837.  Mr. End "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id*. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact." *Id.* at 842.

Mr. End declares that, after reviewing the entirety of Mr. Troupe's file and working with Mr. Troupe for two months, he did not believe Mr. Troupe was suicidal or at substantial risk of serious

self-harm.  Decl. of Walter End at 17–18, ECF No. 53.  Instead, Mr. End states that he agreed with other providers' assessments that Mr. Troupe's self-harm was manipulative in nature.  *Id.* at 18.  The vast majority of the information in Mr. Troupe's file supports Mr. End's assessment.  As to Mr. End's contacts with Mr. Troupe on December 2, 2011, the record before the Court does not demonstrate that Mr. End was deliberately indifferent:  Mr. Troupe had not harmed or threatened to seriously harm himself.[3]  Based on his history, there was a risk that Mr. Troupe might harm himself, but at that time and under the existing circumstances, the risk was neither excessive nor substantial.  Mr. End's declaration indicates that he did not "draw the inference" that a substantial risk of harm existed and the Court finds, under the circumstances, there was no obvious risk to Mr. Troupe that a reasonable prison official would have noticed.  *Farmer*, 511 U.S. at 837; 842.  Therefore, no reasonable jury could find that Mr. End was deliberately indifferent.

Assuming arguendo that Mr. End knew of a substantial risk of harm, he responded reasonably to the risk.  *Id.* at 844–45 ("[P]rison officials who act reasonably cannot be found liable under the [Eighth Amendment].")  When Mr. End learned that Mr. Troupe had declared a mental health emergency, he responded to the IMU and assessed Mr. Troupe, although the length of time it took for him to do so is disputed.  When Mr. End assessed Mr. Troupe (for the second time that day), Mr. Troupe did not articulate a mental health emergency to Mr. End and did not appear to Mr. End to be distressed.  From his

---

[3] Instead, Mr. Troupe had threatened to remove his sutures.  David Troupe, Level 1-Initial Grievance at 211 (Dec. 6, 2011).

assessment, Mr. End determined that Mr. Troupe appeared normal and decided he was not at risk of committing serious harm or suicide but instead was trying to test response times for the purpose of filing a grievance or a lawsuit.    Based on his assessment of Mr. Troupe's mental health, Mr. End believed that Mr. Troupe could safely remain in the IMU under the same protective conditions and should not be placed on the restraint table, which had been utilized in the past after Mr. Troupe self-harmed to prevent continued self-harm.    However, Mr. Troupe's medical providers did not think the restraint table was a long-term solution, as it too was harmful to Mr. Troupe's health.    On the record before it, the Court finds that Mr. End acted reasonably and did not deliberately disregard a significant risk of serious harm to Mr. Troupe.

Even if Mr. End made an incorrect diagnosis, he did not violate the Eighth Amendment.    *Domino v. Tex. Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (holding that when a provider believed that an inmate was threatening suicide for secondary gain and not genuinely, it was an incorrect diagnosis, not deliberate indifference because "an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.").    Mr. End also did not violate the Eighth Amendment because he took reasonable actions that ultimately failed to prevent Mr. Troupe from harming himself after Mr. End had left.    *Id.* at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").    Finally, Mr. End did

1  not violate the Eighth Amendment because he acted reasonably after Mr.

2  Troupe harmed himself by offering Mr. Troupe medical treatment and

3  recommending that he be placed on the restraint table to prevent

4  further harm.

5      The Court must address Mr. Troupe's statement that on March 21,

6  2013, Mr. End said to Mr. Troupe that it was too bad Mr. Troupe did

7  not kill himself in December 2011.  Because Mr. Troupe's version of

8  events is supported by sworn affidavits from two inmates, Attach. 14,

9  ECF No. 91-1, and Mr. End has not asserted that he did not make this

10  statement, the Court takes Mr. Troupe at his word.  The Court notes

11  that a statement of the sort made by Mr. End is certainly unkind and

12  likely unproductive to resolving Mr. Troupe's mental health problems.

13  However, this statement, made more than one year after the events at

14  issue in this case, does not inform the question of Mr. End's state of

15  mind on December 2, 2011, just two months after he began working at

16  WSP.  Mr. End's March 21, 2013 statement was likely the product of

17  exasperation following approximately one and a half years of working

18  with Mr. Troupe and being the subject of a professional complaint

19  filed by Mr. Troupe.  The statement does not change the fact that Mr.

20  End did not believe Mr. Troupe to be at substantial risk of serious

21  self-harm and responded reasonably on December 2, 2011.

22      Finally, for an Eighth Amendment claim to succeed, the action or

23  inaction complained of must be both an actual and proximate cause of

24  the injuries.  *Lemire*, 726 F.3d at 1074; *White v. Roper*, 901 F.2d

25  1501, 1505 (9th Cir. 1990).  An action is an actual cause of harm if

26  the harm would not have occurred but-for the action.  *Conn v. City of*

*Reno*, 591 F.3d 1081, 1098 (9th Cir. 2009), *vacated by* 131 S. Ct. 1812 (2011), *reinstated in relevant part by* 658 F.3d 897 (9th Cir. 2011); *White*, 901 F.2d at 1506.    An action is a proximate cause of harm if the harm was a foreseeable result of the action and not the result of a non-foreseeable, intervening cause.    *Id.* at 1061.

Here, the Court finds that the speed of Mr. End's response was neither an actual nor a proximate cause of Mr. Troupe's self-harm. Mr. Troupe was threatening self-harm prior to Mr. End's arrival in the IMU.    However, Mr. Troupe did not harm himself until *after* Mr. End had checked on him and left the IMU.    Therefore, Mr. End could not have prevented the harm had he responded more quickly, and the speed of Mr. End's response was not a but-for cause of Mr. Troupe's injuries. Additionally, Mr. Troupe's injury was not a foreseeable result of Mr. End's failure to immediately visit his cell.    It was foreseeable that if Mr. End arrived too slowly Mr. Troupe might harm himself prior to Mr. End's arrival but not that Mr. Troupe would harm himself after Mr. End checked on him because Mr. Troupe perceived Mr. End's response to have been too slow and felt slighted.    Mr. Troupe's apparently retaliatory self-harm[4] was not foreseeable, and Mr. Troupe's own actions were the cause of his injuries, not the speed of Mr. End's response to his self-harm threat.

## IV.    CONCLUSION

In sum, no reasonable jury could find that Mr. Troupe was deprived of something sufficiently serious, nor that he was

___

[4] There is also a suggestion in the record that Mr. Troupe self-harmed because he was upset that his cell was dirty.    Dec. 2, 2011 Suicide Risk Assessment at 180, Ex. 3, ECF No. 53-3.

ORDER - 25

incarcerated under conditions posing a substantial risk of suicide or serious self-harm.    Additionally, no reasonable jury could find that Mr. End's response to Mr. Troupe's self-declared mental health emergency on December 2, 2011 was deliberately indifferent because Mr. End believed that Mr. Troupe was not suicidal or at risk of serious self-harm and made a reasonable decision to leave Mr. Troupe in the protective conditions already present in the IMU after assessing his mental health.    After Mr. Troupe harmed himself, Mr. End responded and offered Mr. Troupe prompt and proper care.    Furthermore, the Court finds that the speed with which Mr. End responded to Mr. Troupe's threat of self-harm was not an actual or proximate cause of Mr. Troupe's injuries.    For these reasons, Mr. Troupe's Eighth Amendment deliberate indifference claim fails as a matter of law, and summary judgment for Mr. End is appropriate.    Having found that summary judgment for Defendant is warranted as to Plaintiff's Eighth Amendment claim, the Court need not reach the qualified immunity or injunction issues.

     Defendant asks the Court to award a strike against Plaintiff under 28 U.S.C. § 1915(g) because this case "ha[s] no basis in law or fact" and "is part of a calculated plan by Mr. Troupe to use the legal system to harass and intimidate DOC staff."    Motion for Summary Judgment at 19–20, ECF No. 50.    Even though this case did not survive summary judgment, it required extensive analysis, and the Court cannot say that it was frivolous, malicious, or failed to state a claim. Therefore, the Court declines to impose a strike under 28 U.S.C. § 1915(g).

---

Accordingly, **IT IS HEREBY ORDERED**:

1.   Defendant's motion for summary judgment, **ECF No. 50**, is **GRANTED**.

2.   All pending dates and deadlines are **STRICKEN.**

3.   Judgment is to be entered in Defendant's favor.

4.   This file shall be closed.

**IT IS SO ORDERED.**   The Clerk's Office is directed to enter this Order and provide copies to all counsel and to Mr. Troupe.

**DATED** this  1st  day of July 2015.

s/Edward F. Shea
EDWARD F. SHEA
Senior United States District Judge

Q:\EFS\Civil\2013\5036.msj.1c2.docx
ORDER - 27